

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-11-1996

# Sumitomo Machinery v. AlliedSignal Inc

Precedential or Non-Precedential:

Docket 95-5138

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Sumitomo Machinery v. AlliedSignal Inc" (1996). *1996 Decisions.* Paper 193.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/193

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 95-5138


SUMITOMO MACHINERY CORPORATION OF AMERICA, INC.

v.

ALLIEDSIGNAL, INC.,

Appellant



On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 91-cv-01790)


Argued October 10, 1995

BEFORE:  STAPLETON, McKEE and NORRIS,* <u>Circuit Judges</u>

(Opinion Filed  April 11, l996)

Mark J. Malone (Argued)
Lori D. Linskey
Stier, Anderson & Malone
1120 Route 22 East
Bridgewater, NJ 08807
  Attorneys for Appellee

Douglas S. Eakeley (Argued)
Lowenstein, Sandler, Kohl, Fisher &
 Boylan
65 Livingston Avenue
Roseland, NJ 07068
  Attorney for Appellant

* Honorable William A. Norris, United States Circuit Judge for


1

the Ninth Circuit, sitting by designation.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

In 1991, Sumitomo Machinery Corporation of America ("Sumitomo") and AlliedSignal Inc. ("Allied") settled an environmental lawsuit concerning property sold to Sumitomo by a predecessor of Allied. Their respective responsibilities were delineated in an Environmental Agreement ("Agreement") which incorporated a cleanup plan approved by the New Jersey Department of Environmental Protection ("NJDEP").[1] In 1994, NJDEP tightened the radioactive remediation requirements applicable to the property, effectively giving Sumitomo the choice of executing a Declaration of Environmental Restrictions and Grant of Easement ("DER") or remediating to a higher standard than originally approved. A DER attaches to the title of the land and restricts certain future uses without NJDEP approval.

Before the district court, Allied argued that the Agreement unambiguously required Sumitomo to execute the DER, and Sumitomo argued that it unambiguously did not. The district court denied Allied's request for specific performance or declaratory relief, finding that the Agreement unambiguously

---

[1] In 1994, the New Jersey Department of Environmental Protection and Energy ("NJDEPE") shortened its name to New Jersey Department of Environmental Protection.

placed the costs of remediation on Allied and did not require Sumitomo to enter into the DER.  We find the Agreement ambiguous and will reverse and remand for further proceedings.

I.

Between 1937 and 1939, the Bendix Corporation ("Bendix") acquired land in Teterboro, New Jersey.  At various times since 1939, Bendix used the land for a sewage treatment facility, a thorium/magnesium alloy foundry, a chemical treatment facility to dispose of the radioactive waste magnesium, and storage for various oils and solvents.  In 1977 Bendix subdivided its land and sold one parcel to Sumitomo.  The current litigation concerns the environmental cleanup of this parcel of land ("Site").

By 1988, government investigation had revealed radioactive contamination on the Site.  In 1984 Bendix had merged into Allied, and Allied, as successor, took the lead in formulating a remediation plan for all the land formerly owned by Bendix.  Meanwhile, Sumitomo moved its operations out-of-state in 1988 and attempted to sell the Site.  To do so, Sumitomo had to institute a cleanup plan approved by NJDEP.  See Environmental Cleanup Responsibility Act, N.J. Stat. Ann. §§ 13:1K-6 to 13:1K-13 (West 1991) ("ECRA"), *repealed and replaced by* Industrial Site Recovery Act of 1993, N.J. Stat. Ann. §§ 58:10B-1 to 58:10B-20 (West Supp. 1995) ("ISRA").

2

Unsatisfied with Allied's efforts, Sumitomo hired Dames & Moore, an environmental consulting firm, to perform various environmental tests and to draw up a cleanup plan to submit to NJDEP. In January 1991, Dames & Moore submitted an "ECRA Remedial Investigation and Cleanup Plan" ("Proposed Cleanup Plan") to NJDEP. According to the plan, radioactive contamination would be remediated to 5 pCi/gm for the first 15 cm. of soil, and 15 pCi/gm for any deeper soil ("5/15 standard").[2] Dames & Moore estimated that the plan would require excavating only 300 cubic feet of dirt to remove the "hot spots" of radiation that pushed the site over the 5/15 standard.

On August 30, 1991, NJDEP approved the Proposed Cleanup Plan in a letter ("Plan Approval"). It unconditionally approved the plan for radiological contamination, and no DER was required. In contrast, NJDEP required a DER for PCBs:

> 2.    PCBs in Soil. . .
> The proposal is acceptable provided that a deed restriction be placed on properties where elevated levels of contaminants are allowed to remain on-site. . . .  The deed restriction shall not allow contaminated subsurface soil to be brought to the surface (0-2') above allowable levels.

App. at 475. NJDEP similarly required a DER for metals (chromium):  "Should the metal results be similar to those found in the earlier samples and the chromium is found to be in the trivalent form, no remedial action other than a deed restriction shall be required."  Id.

---

[2]  "pCi/gm" stands for picocuries per gram, a standard of radiological activity.

3

A model DER was attached to the Plan Approval. It states that by executing a DER, the owner of property "impose[s] certain restrictions upon the use and occupancy of the Property, to restrict certain activities at the Property, and . . . grant[s] an easement to NJDEPE." See App. at 301; see also 24 N.J. Reg. 401 (proposed regulation N.J. Admin. Code 7:26D, Appendix A, "Model Document Declaration of Environmental Restrictions and Grant of Easement"). The owner agrees to avoid taking actions that may disturb clean soil covering contaminated land, or that may otherwise cause migration of contaminants. The easement allows NJDEP to enter onto the land, inspect its condition, and do remedial work. The DER is recorded and runs with the property until NJDEP executes and records a release. NJDEP, persons likely to suffer injury, and any citizen of New Jersey are entitled to enforce the DER. Future owners are put on notice by the recordation, and the DER itself requires the owner to notify any lessees of the DER.

In April 1991, Sumitomo sued Allied under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C.A. §§ 9601–9675 (West 1994), to recover response costs for remediating the site. In September 1991, a month after NJDEP approved Sumitomo's plan, the parties settled the suit, and each parties' responsibilities were laid out in the Agreement. Overall, the Agreement shifted the responsibility and costs of cleaning Sumitomo's land onto Allied. The cleanup was to proceed

according to the Proposed Cleanup Plan as modified by the Plan Approval.

Allied attempted to go forward with the remediation, but found that the radiological contamination was more extensive than Dames & Moore had estimated. It discovered soil with both radiological and chemical contamination, "mixed waste," which requires more extensive treatment. The parties dispute what Allied then did, and the propriety of its actions. What is undisputed is that tens of thousands of cubic feet of soil were excavated and stored on site instead of 300. This soil met the plan's 5/15 standard and could be placed back on the Site under the original standard. The remediation has taken much longer than the six months estimated by Dames & Moore.

Due to the delay and extensive excavation of soil, Sumitomo complained about Allied's remediation to NJDEP. Apprised of the new circumstances, NJDEP ordered the remediation to halt and requested an addendum to the Proposed Cleanup Plan. The parties jointly submitted a proposal which suggested the same 5/15 standard ("Plan Addendum").

NJDEP approved the Plan Addendum, but under the more stringent requirements of ISRA, which had been enacted after the Plan Approval. The new legislation established two remediation standards, residential and nonresidential. See § 58:10B-12(c)(1). The residential remediation standard refers to contaminant levels that do not exceed the health risk level appropriate for residential use, as determined by the agency. The

5

nonresidential standard refers to a higher risk level appropriate for uses that are not residential. If a cleanup plan proposes to remediate real property to nonresidential standards, ISRA requires a DER to restrict use of the property to non-residential uses and other uses compatible with the extent of contamination and, in addition, restricts any activities that may bring contaminants above ground. See § 58:10B-13(a)(2).

NJDEP determined that the residential remediation standard for the Site was 3 pCi/gm, based on NJDEP calculations of safe exposure levels for people. It rejected the 5/15 standard as creating too high a health risk for unrestricted use. The approval of the Plan Addendum required the Site to be cleaned to 3 pCi/gm, covered with one foot of uncontaminated fill, and a DER executed to insure that the cover remain in place. Sumitomo and Allied filed formal objections to the new standard in accordance with NJDEP's dispute resolution process. The new standard would be expensive. The tens of thousands of cubic feet of soil stored on the Site could not be placed back onto the land because its contamination exceeded 3 pCi/gm; it would have to be shipped for disposal, a costly proposition. According to Allied, it might also have to raze a warehouse on the property to treat the underlying soil. Exposing the underlying soil would obligate Allied to remediate other contaminants that were otherwise acceptable in place and covered by the warehouse.

Before resolution, Sumitomo withdrew its objection to the new standard and requested NJDEP to enforce it. Nevertheless,

6

Allied pursued dispute resolution, arguing that the agency had improperly calculated the correct residential standard and that the proper standard was the original 5/15 standard. NJDEP eventually agreed that its standard was too stringent, but did not agree that the Site could be unrestricted at the 5/15 standard.  In its letter to Allied dated December 1994, NJDEP stated:

> The NJDEP agrees with your position that the radiological criteria for this site should be 5 pCi/gm above background in the first six inches of soil and 15 pCi/gm in any subsequent six inch layer for [various radiological contaminants]. . . .

> However, the NJDEP does not agree with your proposal regarding the issue of unrestricted use.  Be advised that, in accordance with P.L. 1993, c.139, an institutional and/or an engineering control, in the form of a Declaration of Environmental Restriction, will be required if any concentrations will remain in the soils greater than 5 pCi/gm. This will ensure that any affected soils will not be disturbed.  "Unrestricted use" will be approved when soil concentrations are less than 5 pCi/gm throughout the soil column.

App. at 202.  In effect, NJDEP had changed the residential standard applicable to Allied's cleanup from 3 pCi/gm to 5 pCi/gm, but had not altered ISRA's statutory DER requirement. Thus, Allied could still remediate to the 5/15 standard in the Proposed Cleanup Plan and Plan Approval, but Sumitomo would have to agree to execute a DER.  Alternatively, Allied could remediate the entire soil column to 5 pCi/gm.

Despite continued efforts by Allied, NJDEP did not change its standards any further.  Sumitomo would not execute a

7

DER for the 5/15 standard, so Allied requested the district court to determine, on an expedited basis, whether Sumitomo must do so under the Agreement. By its terms, the Agreement is governed by the laws of New Jersey, and the parties did not argue otherwise. After reviewing the parties' briefs and affidavits accompanying the motion, the district court ruled for Sumitomo, finding that under New Jersey law, the Agreement unambiguously did not obligate Sumitomo to enter into the DER, and to the contrary, placed the burden of regulatory change upon Allied. This appeal followed.

Under 28 U.S.C. § 1291, we have jurisdiction to entertain an appeal from the final order of the district court. The original suit was brought under the Comprehensive Environmental Response, Compensation, and Liability Act, which vests original and exclusive jurisdiction in federal district courts. See 42 U.S.C. § 9613(b) (1994). In the consent order filed in conjunction with the settlement, the district court retained jurisdiction to enforce the Agreement and properly heard Allied's motion.

Allied asks us to interpret the Agreement unambiguously to require the DER, or in the alternative, to find the Agreement ambiguous and remand for an evidentiary hearing. We agree with Allied's alternative argument and hold that the Agreement is ambiguous as to whether Sumitomo must execute the radiological DER, and the factual issue of intent must be resolved on remand.

8

II.

When resolving a contract dispute, the initial determination is whether the contract is ambiguous concerning the dispute between the parties, an issue of law afforded plenary review. See Teamsters Indus. Emp. Welfare Fund v. Rolls-Royce, 989 F.2d 132, 135 (3d Cir. 1993).

A contract is ambiguous "where the contract is susceptible of more than one meaning." Briggs v. United Shoe Machinery Corp., 92 N.J. Eq. 277, 287, 114 A. 538, 542 (N.J.), cert. denied, 254 U.S. 653 (1920). In American Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177 (3d Cir. 1995), we had occasion to consider how a New Jersey court would determine whether there is "more than one meaning":

> [T]he Supreme Court of New Jersey summarized this area of the law in the following terms:
>
> > Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. . . .
>
> [Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301, 96 A.2d 652, 656 (N.J. 1953).]

9

It is important for present purposes to note that extrinsic evidence of the negotiations, conduct and other circumstances of the parties is important to a court's analysis of whether an agreement is ambiguous only to the extent, if any, that such evidence provides "objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980). That is, extrinsic evidence is permitted because the law recognizes that the meaning of words can depend on context, and what may seem unambiguous without context (or in the context that the judge may hypothesize, based on his or her own experience) may be ambiguous when understood from the "linguistic reference point of the parties." Id. See 3 Arthur L. Corbin, Corbin on Contracts § 542 (1960). Cf. 4 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Laws of Contracts § 601, at 310-11 (3d ed. 1961).

Id. at 181-82. We now turn to the Agreement to ascertain whether it is susceptible to more than one meaning.

The district court found that in the Agreement, Allied unambiguously agreed to pay "all costs" of the required cleanup:

> 1. Assumption of Cleanup Responsibilities.
> Subject to the terms and conditions of this Agreement, ALLIED-SIGNAL shall from and after the effective date of this Agreement assume full responsibility for:
>
> . . . .
>
> b) payment of all costs incurred after the effective date of this Agreement relating to or arising from:

10

. . . .
(3)    the conduct of any work at the Site or <u>compliance with requirements that may be imposed by the NJDEPE</u> or other federal, state or local governmental authorities relating to or arising from such Existing Environmental Conditions, including, but not limited to, the posting of required financial assurances, (the "Work").

App. at 269 (emphasis added).  It also undertook the risk and cost of more stringent regulations:

5.  <u>Implementation of Cleanup Plan</u>. . . .  If new, more stringent laws or regulations are enacted which require additional work to be performed at the Site with respect to such Existing Environmental Conditions, ALLIED-SIGNAL shall comply with such laws or regulations to the extent required by the NJDEPE. . . .

<u>Id.</u> at 272.

Allied acknowledges that the preceding Agreement terms required it to remediate to the extent required by the NJDEP, including any requirement based on a change of law.  According to Allied, the ambiguity, if any there be, resides in what remediation is "required" within the meaning of the Agreement when the NJDEP gives the landowner an option between (a) remediating to the standard proposed by the landowner and accepting a DER limiting future use and (b) remediating to a substantially higher standard at substantial additional expense. Allied correctly points out that nothing in the Agreement expressly speaks to what "required" means in this context.  It argues, however, that Paragraph 6 of the Agreement unambiguously reflects an understanding between the parties that "any DER which the NJDEP [might] impose or require for the Site" as a result of

11

their joint proposal would be accepted by Sumitomo, as the landowner, so that Allied would not be required to perform more remediation than set forth in that joint proposal. Paragraph 6 provides:

> 6. <u>Cooperation in Sale or Lease of Site</u>. ALLIED-SIGNAL shall cooperate fully with SUMITOMO in the event of a sale or lease of all or a portion of the Site. . . . *SUMITOMO shall provide any such purchaser or lessee with a copy of this Agreement and any "Declaration of Environmental Restrictions and Grant of Easement" ("Deed Restrictions") which the NJDEPE may <u>impose or require</u> for the Site.* SUMITOMO or any such purchaser or lessee shall fully comply with the terms of such Deed Restrictions which limit utilization of the Site. ALLIED-SIGNAL shall comply with the terms of such Deed Restrictions that are applicable to its conduct of the Work and shall pay for any portion of the Work required by the NJDEPE as part of any "Deed Restrictions."

<u>Id.</u> at 273-74 (emphasis added).

The district court was unpersuaded by Allied's interpretation of Paragraph 6. It was important to the court that Sumitomo had never agreed specifically to a radiological DER and that NJDEP had approved the original remediation plan without one. Paragraph 6 could not be read to obligate Sumitomo to enter into the radiological DER because NJDEP had not "imposed or required" it, and the Agreement plainly referred to only DERs "imposed or required". As a result of the dispute resolution process, the radiological DER was one of two alternatives, the proposed 5/15 remediation standard plus a DER, or remediation to 5 pCi/gm for the entire soil column.

After considering the alternative interpretations of the Agreement, we find Paragraph 6 ambiguous concerning

12

Sumitomo's obligations with respect to the radiological DER. While we agree with the district court that Paragraph 6 can reasonably be read to impose no relevant obligation on Sumitomo, we also find it reasonable to interpret the paragraph as reflecting an understanding that Sumitomo would execute a DER such as the one at issue here. The district court erred in its interpretation of "imposed and required," and should have found Allied's interpretation also to be a reasonable one.

It is important at the outset to put Paragraph 6 in the regulatory context in which it was negotiated. The regulatory scheme in place at the time the Agreement was negotiated is, of course, competent extrinsic evidence concerning the meaning the parties gave to their descriptions of agency action.

ISRA gives the owner of contaminated property a choice between a DER or a more stringent remediation standard. Property may be remediated to a standard less stringent than the residential soil remediation standard if a DER is executed, see § 58:10B-13(a), but NJDEP may not impose a DER without the consent of the owner. See § 58:10B-12(h)(3). If the owner does not consent, he or she is required to remediate to the residential soil remediation standard. See § 58:10B-13(b). While ISRA may properly be viewed as a more "stringent law" within the meaning of Paragraph 5 of the Agreement, its imposition of a DER as a condition of utilizing a less strict standard continues the practice that existed prior to ISRA.

13

The imposition of a DER is a responsive regulatory process. The owner of contaminated land submits a cleanup plan, and in response to the proposal, NJDEP may impose or require a DER. That is what it means to "impose or require" a DER, and the parties must have understood this meaning at the time of the Agreement was negotiated and executed. Dames & Moore submitted the Proposed Cleanup Plan on behalf of Sumitomo in January of 1991, as required by ECRA. In August, NJDEP responded with its Plan Approval, approving the plans for some contaminants unconditionally, and imposing DERs on the proposed cleanup of other contaminants.

NJDEP imposed the radiological DER in the same manner. Sumitomo proposed the 5/15 standard in the original cleanup plan. When NJDEP requested the Plan Addendum, Sumitomo, together with Allied, proposed the 5/15 standard again. In response, NJDEP imposed much stricter requirements. Through dispute resolution NJDEP relaxed the new requirements, and in the end only imposed a DER on the 5/15 standard proposed in the Plan Addendum. The radiological DER was imposed and required in the responsive regulatory process typical for a cleanup plan, a process the parties were aware of when they executed the Agreement.

Sumitomo would read "imposed or required" as meaning only DERs *absolutely* imposed or required, with no choice or option given. This interpretation is untenable. A DER is always optional in the sense that contaminated land could always be remediated to such a clean level that no DER could be required.

14

In the Plan Approval, NJDEP required a DER for PCBs so long as "elevated levels of contaminants are allowed to remain on site." Impliedly, if Sumitomo had proposed to remediate PCBs below "elevated levels" throughout the Site, NJDEP would not have imposed a DER. Where a DER may be required, an owner of land always has the choice of the DER or remediating to the residential standard.

If "imposed or required" were read throughout the Agreement to exclude any regulations or laws imposed in the form of alternatives, Allied could not be required to remediate to the more stringent standard. Paragraph 1(b)(3) states that Allied will pay "all costs . . . arising from . . . compliance with requirements that may be <u>imposed</u> by the NJDEPE," and Paragraph 5 states that Allied will comply with "more stringent laws or regulations," but only "to the extent <u>required</u> by the NJDEPE." (emphasis added). Here, NJDEP required either that a radiological DER be executed or that the entire soil column be remediated to the residential standard. Just as the radiological DER was not *absolutely* imposed on Sumitomo, neither was the more stringent standard *absolutely* imposed on Allied. If we followed Sumitomo's reading of "imposed or required" to its logical conclusion, DERs would fall outside the scope of the Agreement.

With this background we return to the key provision of Paragraph 6: "SUMITOMO shall provide any such purchaser or lessee with a copy of this Agreement and any "Declaration of Environmental Restrictions and Grant of Easement" ("Deed

15

Restriction") which the NJDEPE may impose or require for the Site." If Sumitomo has any obligation to execute a radiological DER, it arises from this provision.

As the district court found, Paragraph 6 can reasonably be read to create no obligation on Sumitomo's part to accept a DER. The paragraph generally concerns the duties of the parties in the event of a sale or lease of the Site. Read in this context, Sumitomo may have undertaken only the duty to provide a purchaser or lessee with copies of any DER that happened to be attached to the land at the time of transfer. The key provision in Paragraph 6 refers to a duty to provide a "copy of this Agreement and any [DER]." The listing of the Agreement as well as any DER suggests that the clause creates a duty to provide copies of certain documents, not a duty to execute those documents. Nowhere in Paragraph 6 is it explicitly stated that Sumitomo has a duty to execute a DER.

However, it is also entirely reasonable to interpret Paragraph 6 as creating a duty to execute future DERs. The paragraph is entitled "Cooperation in Sale or Lease of Site," but it is also the place in the Agreement where the parties discuss their obligations with respect to DERs. The second half of the paragraph not only discusses Sumitomo's promise to provide any DER imposed or required by NJDEP, but it also discusses each of the parties' obligations to comply with the terms of any such DER. Most important, the obligation assumed by Sumitomo in Paragraph 6 is not stated in terms of "currently existing DERs"

16

or "any DER that Sumitomo may hereafter accept." Sumitomo commits itself to deliver "any [DER] which the NJDEPE may impose or require for the Site." Given that the only DER that would be of any concern to a purchaser of the Site would be those that had been accepted by Sumitomo, it is not unreasonable to suggest that the obligation to deliver any DER which NJDEP might impose or require necessarily presupposed that Sumitomo would accept any DER that NJDEP might propose as a condition of approving its proposal.

## III.

In connection with their cross motions for summary judgment, Allied and Sumitomo submitted affidavits of their representatives during the course of the negotiation of this Agreement. In his affidavit, James A. Schutt, Allied's representative, averred that "the parties specifically discussed the appropriateness of using clean up standards that took into consideration the future use of the Site as industrial property and that a DER [might] be required." According to Schutt, the Sumitomo representatives "agreed that industrial standards were appropriate, [and] that a DER was acceptable." App. at 211. Sumitomo's President, William M. Lechler, insisted in this affidavit, however, that "Sumitomo never committed to entering into a DER for any kind of contamination." App. at 512. The extrinsic evidence presented by the parties was thus in conflict.

17

When a contract is ambiguous, the "fact-finder must attempt to discover what the contracting parties . . . intended [the disputed provisions] to mean."  Teamsters Indus. Emp. Welfare Fund, 989 F.2d at 136.  In order to make such a determination, "objective evidence in support of [the competing] interpretation[s] should be considered by the fact finder."  Mellon Bank, 619 F.2d at 1011.  When there is a material conflict in the extrinsic evidence concerning the objective context of the contract, the trier of fact has no choice but to conduct an evidentiary hearing and resolve the conflict.  On remand, the district court will hear all relevant extrinsic evidence the parties wish to tender, will resolve any conflict in that evidence, and will make findings of fact with respect to the intent of the parties.

## IV.

We will reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

18