

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-11-2003

# USA v. Pantelidis

Precedential or Non-Precedential: Precedential

Docket No. 02-3436

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Pantelidis" (2003). *2003 Decisions.* Paper 327.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/327

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 11, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-3436 and 02-4318

UNITED STATES OF AMERICA

v.

JERRY PANTELIDIS,
Appellant No. 02-3426

Appeal from an Order of the District Court
From the Eastern District of Pennsylvania
Denying Motion for Return of Property
in Criminal No. 01-694-01

United States District Judge Herbert J. Hutton

IN RE: JERRY PANTELIDIS
Petitioner No. 02-4318

On Petition for a Writ of Mandamus
From the Eastern District of Pennsylvania
(Related to Crim No. 01-cr-694)

Argued: April 1, 2003

Before: McKEE and SMITH, *Circuit Judges*,
and COWEN, *Senior Circuit Judge*

(Opinion filed: July 11, 2003)

JAMES M. BECKER, ESQ. (Argued)
JAMES A. KELLER, ESQ.
Saul Ewing LLP
3800 Centre Square West
1500 Market Street
Philadelphia, PA 19102
*Attorneys for Appellant/Petitioner*

PATRICK L. MEEHAN, ESQ.
United States Attorney
LAURIE MAGID, ESQ.
Deputy United States Attorney
 for Policy and Appeals
ROBERT A. ZAUZMER, ESQ.
Assistant United States Attorney
Chief of Appeals
PAUL L. GRAY, ESQ. (Argued)
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
*Attorneys for Appellee/Respondent*

---

## OPINION OF THE COURT

---

McKEE, *Circuit Judge*.

Jerry Pantelidis appeals from the district court's order denying his motion for return of property filed under Fed.R.Crim.P. 41(e). He claims that he is entitled to the return of certain funds escrowed pursuant to the terms of a non-prosecution agreement. However, since we conclude that the agreement is ambiguous, we will vacate the district court's order and remand for further proceedings so that the district court can resolve the ambiguity.

## I. FACTS AND PROCEDURAL HISTORY

On November 5, 2001, a federal grand jury returned an indictment charging Jerry Pantelidis with seven counts of making false statements to federally insured financial institutions, in violation of 18 U.S.C. § 1014, two counts of bank fraud, in violation of 18 U.S.C. § 1344, one count of

making a false oath in a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2), and one count of use of a false social security number, in violation of 42 U.S.C. § 408(a)(7). The false statement and bank fraud counts charged that Pantelidis advanced his real estate business interests by making false and fraudulent statements, including: fraudulently creating fictitious income tax returns claiming inflated income amounts; creating false financial statements; and making false declarations of income and assets in order to secure bank loans and lines of credit totaling in excess of $3.5 million, and to secure credit cards and a car lease. The indictment further alleged that Pantelidis earned hundreds of thousands of dollars profit from the acquisition, development and resale of properties which Pantelidis purchased using fraudulently obtained financing. The indictment also contained a notice of forfeiture concerning $637,411.40 in proceeds obtained directly or indirectly from the violations of 18 U.S.C. §§ 1014 and 1344, and a notification of the government's intention, if necessary, to seek forfeiture of substitute assets, up to the value of the property subject to forfeiture.[1]

According to the government, the amount of the funds in the notice of forfeiture in the indictment, viz., $637,441.40, represents the total net proceeds Pantelidis realized from the sale of two buildings he purchased or improved using the fraudulently obtained funds. Those buildings were located at 311 S. Juniper Street and 1315 Walnut Street in Philadelphia. This appeal also involves proceeds derived from the sale of the Barclay Hotel in Philadelphia.

### A. 311 S. Juniper Street.

Count Two of the indictment charged that Pantelidis made false statements to Regent National Bank to obtain a $500,000 loan to purchase and improve upon a property at 311 S. Juniper Street, in violation of 18 U.S.C. § 1014. The indictment alleged that in late 1994 Pantelidis supplied the bank with copies of his federal income tax returns for the

---

1. If the government cannot reach illegal proceeds directly, it can, under 21 U.S.C. § 853(p), seek forfeiture of other property of the defendant, called "substitute assets," up to the value of the property.

years 1991, 1992 and 1993, on which returns he claimed adjusted gross income of $107,706, $133,675 and $162,423, respectively. The indictment further alleged that Pantelidis had not filed federal income tax returns during those years, and that the returns he furnished to the bank were fictitious and contained inflated income. According to the government, Pantelidis's actual federal income tax returns for those years, filed with the IRS in April 1995, showed true income during 1991, 1992 and 1993, of minus $9,996, minus $34,878, and minus $59,908, respectively.

On February 3, 1998, Pantelidis's company, 311 S. Juniper Street, Inc., sold the property on Juniper Street. The proceeds check from the sale of the property, $263,901.40, was seized by the government pursuant to a seizure warrant executed at the real estate closing. The indictment seeks the forfeiture of these alleged proceeds of the § 1014 violation. The proceeds are currently worth $87,973, as will be explained later.

## B.   1315 Walnut Street.

Count Three charged that Pantelidis defrauded Regent National Bank, while attempting to obtain a $1,300,000 secured line of credit to pay delinquent taxes and make capital improvements to a property at 1315 Walnut Street, in violation of 18 U.S.C. § 1344. The indictment alleged that Pantelidis supplied the bank with a personal financial statement dated May 10, 1995, in which he claimed to have filed federal income tax returns for the years, 1991, 1992 and 1993. The indictment alleged that Pantelidis made the claim knowing that Regent would rely on the fictitious income tax returns he had previously given the bank in connection with the Juniper Street property. The indictment further alleged that Pantelidis did not give the bank his true 1991, 1992 and 1993 federal income tax returns, which he had filed with the IRS only sixteen days earlier on April 24, 1995, but which showed negative income during the three years, as described above.

After the seizure of the 311 S. Juniper Street proceeds, the government learned that Pantelidis intended to sell the 1315 Walnut Street property. Pantelidis's former counsel

was aware by then that the government had the same forfeiture claim to the proceeds of the sale of this property: the building was improved using a $1,300,000 loan allegedly obtained through deceiving Regent National Bank. Rather than cause the government to apply for another seizure warrant, Pantelidis's former counsel attended the April 6, 1999 closing, which was also attended by an FBI agent, and agreed to have the proceeds of the sale of the building placed in escrow accounts. As a result of the agreement, Pantelidis escrowed approximately $447,540. Approximately $267,180 of this amount remains escrowed.

### C. The Barclay Hotel.

Count Eleven charged Pantelidis with making a false oath before the bankruptcy court during hearings on two competing plans of reorganization to purchase the Barclay Hotel from bankruptcy. One of the plans was Pantelidis's. Pantelidis is accused of claiming to have "a little under a million" in cash and readily marketable securities available to him to secure financing for the project. The indictment alleged that Pantelidis actually had approximately $101,000 in cash and unpledged securities at the time. The indictment also alleged that Pantelidis's financial status was a material matter to the bankruptcy court.

Neither of the two plans was accepted, which necessitated the sale of the hotel at auction. At auction, Pantelidis won the right to purchase the hotel for $5.5 million, which he did in January 1997. According to the closing documents from the subsequent sale of the hotel in June 1999, Pantelidis was paid in excess of $9 million for the hotel less than two and one-half years after he purchased it for $5.5 million. His profit allowed Pantelidis to pay off more than $4 million in business and personal debts.

At the time of closing in June 1999 (which was two months after the sale of his 1315 Walnut Street property), and while Pantelidis and the government were in plea negotiations, the government learned that Pantelidis wished to sell his interest in the Barclay. As noted in an agreement reached between Pantelidis and the government concerning

the sale, the government was aware of a difficult situation involving the property and the benefits to be obtained through the sale. The parties to the sale, and others, requested that the government clear the way for the sale of the building.

The government agreed not to seek money laundering charges against Pantelidis concerning the sale of the Barclay, primarily on the condition that, from the gross proceeds of the sale, Pantelidis escrow $850,000 allegedly owed to Elizabeth McHenry, an elderly benefactor of Pantelidis, and that he escrow all remaining proceeds from the sale.

On June 25, 1999, a week after the government agreed not to seek money laundering charges against him, Pantelidis sold his interest in the Barclay. The closing documents for the sale show that, as agreed, Pantelidis escrowed $855,496.50 for the benefit of Elizabeth McHenry, and escrowed the net proceeds of the sale, $371,211.35. Exhibit A to the closing documents shows that company and personal debts of Pantelidis, well in excess of $4 million, were paid off from the gross proceeds. Among the debts paid off were: $20,000 to Elizabeth McHenry's attorneys; $236,250 to Pantelidis's civil attorneys; $50,000 to Pantelidis's accountant; $212,000 to certain of Pantelidis's employees; $68,250 to Pantelidis's criminal attorney; and $2,255,863 to the Barclay Condo Association. The Barclay proceeds were also used to pay off three loans to Pantelidis which were, according to the indictment, procured by false statements or fraud. These bank loans are involved in Counts Four, Five and Six of the indictment.

Approximately $150,000 of the $371,211 net proceeds from the Barclay sale remains in escrow. The government does not contend that the remaining $150,000 constitutes direct proceeds of criminal activity. Rather, because the government says that it cannot recover the entire $637,441.40 in proceeds from the remaining seized and escrowed funds available for forfeiture from the Juniper Street and Walnut Street properties (now approximately $355, 153), the indictment seeks to forfeit the $150,000 as substitute assets pursuant to 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p).

## D.   Disposition of the Seized and Escrowed Funds.

The seized and escrowed funds from the three properties — Juniper Street, Walnut Street and the Barclay — totaled approximately $1,938,000, including the $850,000 for Elizabeth McHenry. After the closing of the Barclay sale in June 1999, Elizabeth McHenry's attorney began negotiations to cause the government to pay over to Elizabeth McHenry two-thirds of the total escrowed funds from Pantelidis's real estate sales for what the attorney claimed was an "equitable interest" that Elizabeth McHenry (then 90 years old) and her deceased sister, Mary McHenry, had in Pantelidis's real estate portfolio. According to the attorney, this equitable interest arose from an oral agreement between the McHenry sisters and Pantelidis early on in Pantelidis's real estate career whereby the McHenrys allowed Pantelidis to use their funds to finance his real estate operations in return for a two-thirds interest in his real estate business. The government agreed to pay over two-thirds of the escrowed funds on the condition that Elizabeth McHenry terminate Pantelidis's existing power of attorney over her funds. Ms. McHenry terminated Pantelidis's existing power of attorney on May 5, 2000. Thereafter, the government, with Pantelidis's agreement, paid over approximately $1,481,261 for the benefit of Ms. McHenry.

According to the government, after the disbursement to Ms. McHenry, the following funds remain held to satisfy Pantelidis's possible forfeiture obligations: (a) a $87,973.80 check, plus interest earned, in the custody of the U.S. Marshall and derived from the sale of 311 S. Juniper Street; (b) approximately $267,180 held in escrow from the proceeds of the sale of 1315 Walnut Street; and (c) approximately $150,000 in escrowed proceeds from the sale of the Barclay Hotel.

### E.   Pantelidis's Rule 41(e) motion.

On January 4, 2002, Pantelidis filed a motion for return of property under Fed.R.Crim.P. 41(e).[2] The motion sought

---

2. When Pantelidis filed his Rule 41(e) motion it provided:

the return of approximately $500,000 in potentially
forfeitable funds constituting the proceeds of Pantelidis's
real estate transactions. All but approximately $87,000 had
been, as noted, voluntarily placed into escrow accounts
before indictment during 1998 and 1999, by Pantelidis
pending plea discussions between the parties. On February
21, 2002, Pantelidis moved for a hearing on his Rule 41(e)
motion. On April 10, 2002, the government responded to
Pantelidis's motion. And, on May 8, 2002, the government
filed an *ex parte* motion for a restraining order under 18
U.S.C. § 981 and 21 U.S.C. § 853(e)(1), seeking the pre-trial
restraint of portions of the seized and escrowed funds
obtained directly or indirectly from the violations of 18
U.S.C. §§ 1014 and 1344. The government claimed that it
did not attempt to restrain the $150,000 of Barclay funds
which it considers substitute assets for forfeiture purposes.

On August 12, 2002, Pantelidis moved for an order
directing the government to serve him with a copy of its *ex*

> A person aggrieved by an unlawful search and seizure or by the
> deprivation of property may move the district court for the district
> in which the property was seized for the return of the property on
> the ground that such person is entitled to lawful possession of the
> property. The court shall receive evidence of any issue of fact
> necessary to the decision of the motion. If the motion is granted, the
> property shall be returned to the movant, although reasonable
> conditions may be imposed to protect access and use of the property
> in subsequent proceedings. If a motion for return of property is
> made or comes on for hearing in the district of trial after an
> indictment or information is filed, it shall be treated also as a
> motion to suppress under Rule 12.

On April 20, 2002, the Supreme Court entered an order amending the
Federal Rules of Criminal Procedure 1 through 60, effective December 1,
2002. As a result, Rule 41(e) became Rule 41(g) and provides:

> A person aggrieved by an unlawful search and seizure of property or
> by the deprivation of property may move for the property's return.
> The motion must be filed in the district where the property was
> seized. The court must receive evidence on any factual issue
> necessary to decide the motion. If it grants the motion, the court
> must return the property to the movant, but may impose reasonable
> conditions to protect access to the property and its use in later
> proceedings.

*parte* application. However, on August 26, 2002, the district court issued an order denying Pantelidis's Rule 41(e) motion for return of property. The district court did not hold a hearing nor did it make any findings concerning the motion.

On September 3, 2002, Pantelidis filed a notice of appeal from the district court's denial of his motion for return of property. Thereafter, on September 9, 2002, the district court, at Pantelidis's request, granted a stay of the criminal proceedings pending his appeal.[3]

## II.  DISCUSSION

Pantelidis argues that (1) the $150,000 Barclay funds be returned to him because they are substitute assets not subject to pre-conviction restraint and (2) the district court erred by not conducting an evidentiary hearing and making factual and legal findings on his Rule 41(e) motion. The government agrees with Pantelidis that the district court erred by not conducting a hearing on Pantelidis's Rule 41(e) motion as to the non-Barclay funds. Therefore, we will remand to the district court so that it can conduct a hearing on Pantelidis's motion as to the non-Barclay funds. However, the government contends that Pantelidis is not entitled to the return of the Barclay funds because they have been escrowed pursuant to the terms of the non-prosecution agreement.

### A.  Appellate Jurisdiction.

Before beginning the inquiry into whether the Barclay funds should be returned to Pantelidis, we must first determine whether we have jurisdiction over his appeal. Pantelidis's appeal is from the district court's denial of his Rule 41(e) motion to return the escrowed and seized funds. Rule 41(e) provides, in relevant part:

---

3. On November 7, 2002, Pantelidis filed a petition for a Writ of Mandamus. By an order dated February 5, 2003, we consolidated that petition with this appeal. However, in his brief, Pantelidis does not address his petition for a writ of mandamus. Therefore, we must assume that he has abandoned that petition.

> A person aggrieved by an unlawful search and seizure or by the deprivation of property may move . . . for the return of the property on the ground that such person is entitled to lawful possession of the property.

Fed.R.Crim.P. 41(e).[4] As a general principle, "[a]n order denying return of property would not be final and appealable if the government were holding the property as evidence in a potential criminal prosecution." *Government of the Virgin Islands v. Edwards*, 903 F.2d 267, 272 (3d Cir. 1990) (citing *DiBella v. United States*, 369 U.S. 121 (1962)). Nonetheless, the government argues that we have jurisdiction under 28 U.S.C. § 1292(a)(1). It is undisputed that asset restraint orders are to be treated like injunctions which are immediately appealable under § 1292(a)(1). *In re Assets of Martin*, 1 F.3d 1351, 1356 (3d Cir. 1993). In the government's view, because the practical effect of the district court's denial of Pantelidis's Rule 41(e) motion is to continue the pretrial restraint of the escrowed Barclay funds, the district court's order is appealable as if it were an injunction under § 1292(a)(1).

In spite of the logical appeal of the government's argument, our decision in *United States v. Furina*, 707 F.2d 82 (3d Cir. 1983), prevents us from analogizing the denial of Pantelidis's Rule 41(e) motion to an injunction for jurisdictional purposes under 1292(a)(1). In *Furina*, business records and other documents belonging to the defendants, who had not been arrested or indicted, were seized by federal agents pursuant to search warrants for presentation to a grand jury. The defendants moved under Rule 41(e) for the return of the seized materials, claiming that the search warrants were defective. The district court denied the motion and the defendants appealed. On their appeal, the appellants argued, *inter alia*, that we had jurisdiction under § 1292(a)(1) "for in effect the district court has denied appellants an interlocutory injunction." *Id.* at 84-85. We refused to accept the analogy and "reject[ed] this attempt to sidestep the policy against piecemeal appeals by dressing the motion in 'equitable garb'." *Id.* at 85 (quoting *Smith v. United States*, 377 F.2d 739, 742 (3d

---

4. *See* n.2, *supra.*

Cir. 1967)). *Furina* has not been overruled or limited, and it is indistinguishable from this case. Therefore, § 1292(a)(1) does not provide us with jurisdiction over this appeal.

However, we do believe that we have jurisdiction under 28 U.S.C. § 1291. In *DiBella v. United States*, 369 U.S. 121 (1962), the Supreme Court held that, generally, the denial of a pre-indictment Rule 41(e) motion to suppress evidence[5] allegedly procured through an unreasonable search and seizure is not final for purposes of appeal under § 1291. However, the Court in *DiBella* "recognized an exception for appeals from independent proceedings." *Furina*, 707 F.2d at 84. Under the *DiBella* exception, there is sufficient independence to allow an immediate appeal "[o]nly if the motion is solely for the return of property and is in no way tied to a criminal prosecution in esse against the movant." 369 U.S. at 131-32. *See also In re Search Warrant (Sealed)*, 810 F.2d 67, 70 (3d Cir. 1987) ("A significant exception, however, allows for immediate appeal of orders that are sufficiently independent from the anticipated criminal proceeding."); *United States v. Premises Known as 608 Taylor Ave.*, 584 F.2d 1297, 1300 (3d Cir. 1978) ("The

---

5. At the time *DiBella* was decided, Rule 41(e) provided:

A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property and to suppress for use as evidence anything so obtained on the ground that (1) the property was illegally seized without warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial. The motion to suppress evidence may also be made in the district where the trial is to be had. The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.

369 U.S. at 122 n.1.

Supreme Court has indicated that the finality of an order relating to a potential criminal prosecution is governed by the independence of the order from the criminal proceeding."); *Government of the Virgin Islands v. Edwards*, 903 F.2d at 272 ("[A]n order is final if the essential character of the motion is for the return of property which is not intimately involved in the criminal process.") (citation omitted).

In this case, both requirements of the *DiBella* exception are satisfied. First, Pantelidis's Rule 41(e) motion sought only the return of the Barclay Funds and did not seek to suppress the evidentiary value of those assets. *See Premises Known as 608 Taylor Avenue*, 584 F.2d at 1300. Second, the Barclay Funds are "in no way tied to a criminal prosecution in esse against" Pantelidis. The Barclay Funds are substitute assets. *See* 18 U.S.C. § 982 (b) and 21 U.S.C. § 853(p). The substitute asset provisions will become operative only if Pantelidis is convicted of the crimes charged in the indictment and only if the profits he received directly or indirectly from those crimes cannot be otherwise recovered. 21 U.S.C. §§ 853(p)(1)(A) - (E) and 853(p)(2). Therefore, in a very real sense, substitute assets are "assets not associated with the crime." *United States v. Field*, 62 F.3d 246, 247 (8th Cir. 1995). Accordingly, the order denying Pantelidis's Rule 41(e) motion is independent from the criminal proceeding and we have jurisdiction under § 1291.

## B. The Barclay Funds.

Approximately $150,000 of the proceeds from the Barclay sale remain in escrow. The Barclay funds are substitute assets and the government seeks their forfeiture as such under 18 U.S.C. § 982(b) and 21 U.S.C. § 853(p). Pantelidis argues that the district court erred by not releasing the Barclay funds to him because, as substitute assets, they are not subject to pre-conviction restraint.[6] The government concedes, as it must, that substitute assets are not subject

_____

6. Pantelidis claims that he needs the Barclay funds to pay his legal fees and living expenses. The government claims that Pantelidis sought the return of the Barclay funds only after pre-indictment negotiations failed.

to pretrial restraint.[7] *United States v. Field*, 62 F.3d 246 (8th Cir. 1995); *United States v. Floyd*, 992 F.2d 498 (5th Cir. 1993); *see also In re Assets of Martin*, 1 F.3d 1351 (3d Cir. 1993) (pre-conviction restraint of substitute assets impermissible under RICO forfeiture provisions). However, the government argues that the Barclay funds are subject to pretrial restraint because the non-prosecution agreement that Pantelidis entered into allows the funds to remain escrowed for purposes of forfeiture. Not unexpectedly, Pantelidis claims that he never agreed to the pretrial restraint of the Barclay funds.

The government's position is straightforward. It argues that Pantelidis and the government agreed to allow the Barclay sale to proceed and each party gave consideration for their respective promises. The government agreed to "refrain from initiating criminal charges against Pantelidis or his corporate entity charging a money laundering violation from the monetary and/or financial transaction which is the sale." App. 30a. In return, Pantelidis agreed to have the proceeds of the sale to be used to satisfy certain claims, and agreed to "[e]scrow all remaining proceeds from the sale." App. 31a. Moreover, the government expressly reserved its right to seek forfeiture with respect to any criminal offenses which pre-dated or post-dated the sale. App. 30a. At the same time, Pantelidis and the government entered into an escrow agreement, which provided in part:

> Escrow Agent will release funds upon the following conditions:
>
> 1) An Agreement between Jerry Pantelidis and the United States Government; or
> 2) Final unappealable Judicial Order by a court of competent jurisdiction.

App. 32a.

In the government's view, by entering into the non-prosecution agreement, Pantelidis consented to the restraint of the Barclay funds beyond that permitted by the law with respect to substitute assets. According to the

---

7. Pantelidis calls it "pre-conviction restraint" and the government calls it "pretrial restraint."

government, Pantelidis received valuable consideration for that concession in the form of the government's agreement not to initiate money laundering charges against him. The government also notes that it lived up to its part of the agreement. However, argues the government, if the Barclay funds are returned to Pantelidis, the government will not receive the benefit of the bargain struck between it and Pantelidis.

Pantelidis's argument that he did not agree to the pretrial restraint of the Barclay funds is equally straightforward. He first argues that the agreement contains a reservation of rights which provides: "Pantelidis reserves *all rights* with respect to the disposition of the proceeds of the Barclay sale." App. 31 (Pantelidis's emphasis). According to Pantelidis, one such reserved right is the right to use the Barclay funds prior to trial. He next argues that neither the non-prosecution agreement nor the escrow agreement provides that the Barclay funds must remain in escrow until the criminal prosecution is completed. He claims that the above-quoted language of the escrow agreement means that, in the absence of an agreement between the parties, either party is free to seek a court order determining the disposition of the funds. And, says Pantelidis, that's precisely what he has done. He contends that if the government had intended for the funds to remain in escrow until the criminal prosecution was completed, then the government, as the drafter of the agreements, would have included an explicit provision to that effect. He notes that neither the agreement nor the escrow agreement contains any such provision. Therefore, he argues that he is entitled to seek recovery of the Barclay Funds.

Although the agreements rise against the backdrop of a criminal prosecution, they are nevertheless, contracts. In resolving a contract dispute, "the initial determination is whether the contract is ambiguous concerning the dispute between the parties." *Sumitomo Machinery Corp. of America, Inc. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir. 1996). The determination of whether a contract is ambiguous is a question of law. *Taylor v. Continental Group Change In Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir. 1991). A contract is ambiguous "where the contract is

susceptible of more than one meaning," *Sumitomo Machinery*, 81 F.3d at 332, or "if it is subject to reasonable alternative interpretations." *Taylor*, 933 F.2d at 1232.

After reading the disputed language, and considering the conflicting arguments of the parties, we frankly come to the conclusion that the government's reading and Pantelidis's reading of the non-prosecution agreement are both reasonable alternative interpretations. Therefore, the non-prosecution agreement is, by definition, ambiguous as to Pantelidis's entitlement to the Barclay Funds. Consequently, a remand is warranted to enable the district court to resolve that ambiguity in the first instance. On remand, the district court can resolve the ambiguity by applying the framework we outlined in *In re New Valley Corp.*, 89 F.3d 143, 149-150 (3d Cir. 1996).

## III.  CONCLUSION

For the above reasons, we will remand to the district court for proceedings consistent with this opinion.

A True Copy:
          Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*