# United States Court of Appeals
## For the First Circuit

No. 11-2030

STANLEY KOLBE,

Plaintiff, Appellant,

v.

BAC HOME LOANS SERVICING, LP, d/b/a BANK OF AMERICA, N.A.;
BALBOA INSURANCE COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Lipez, and Thompson, Circuit Judges.

Edward F. Haber, with whom Todd S. Heyman, Adam M. Stewart,
Michelle H. Blauner, and Shapiro Haber & Urmy LLP were on brief,
for appellant.
John C. Englander, with whom Matthew G. Lindenbaum, Dennis
D'Angelo, and Goodwin Procter LLP were on brief, for appellees.

September 21, 2012

**LIPEZ, Circuit Judge**.  This putative class action is one of a number of breach-of-contract suits being brought against financial institutions nationwide by mortgagors who claim that they were improperly forced to increase flood insurance coverage on their properties.[1]  The plaintiff in this case, Stanley Kolbe, asserts that Bank of America's demand that he increase his flood coverage by $46,000 breached both the terms of his mortgage contract and the contract's implied covenant of good faith and fair dealing.  The district court concluded that the pertinent provision of the mortgage unambiguously permitted the lender to require the increased flood coverage and, hence, it granted the defendants' motion to dismiss the complaint.

Having closely examined the mortgage language at issue and the relevant context, we are persuaded that the mortgage is reasonably susceptible to an understanding that supports Kolbe's breach of contract and implied covenant claims.  We therefore vacate the judgment of dismissal in favor of the Bank.[2]

**I.**

The following facts are drawn from the allegations in the complaint.  See Román-Oliveras v. P.R. Elec. Power Auth., 655 F.3d

---

[1] We address another one of these actions in a separate decision also issued today, Lass v. Bank of America, N.A., No. 11-2037.

[2] Federal jurisdiction in this case is premised on the court's diversity jurisdiction over class actions alleging aggregated damages in excess of $5 million.  See 28 U.S.C. § 1332(d).

43, 45 (1st Cir. 2011).  In October 2008, appellant Kolbe borrowed $197,437 from a mortgage company to finance the purchase of his home in Atlantic City, New Jersey.  The loan is guaranteed by the Federal Housing Administration ("FHA"), an agency within the Department of Housing and Urban Development ("HUD"), and Kolbe's mortgage in all material respects tracks the FHA's Model Mortgage Form for single-family homes.  See FHA Single Family Origination Handbook 4165.1, App'x II, available at http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4165.1/41651hbHSGH.doc (last visited Sept. 18, 2012); see also 24 C.F.R. § 203.17(a)(2)(i) (stating that FHA mortgages "shall be in a form meeting the requirements of the [Federal Housing] Commissioner").  Paragraph 4 of both the model mortgage form and Kolbe's agreement describes the borrower's obligation to maintain hazard insurance, in pertinent part, as follows:

> 4.  **Fire, Flood and Other Hazard Insurance**.
> Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary [of HUD].

Federal law required Kolbe to obtain flood insurance because his property is located in an area designated as a special

-3-

flood hazard zone under the National Flood Insurance Act ("NFIA"). See 42 U.S.C. §§ 4001-4129.[3] The minimum amount of such insurance also is mandated by law. Under the NFIA, the flood coverage for a residential property securing a mortgage issued by a federally regulated lender must be in an amount at least equal to the outstanding principal balance of the loan, or $250,000, whichever is less. Id. §§ 4012a(b)(1), 4013(b)(2); 24 C.F.R. § 203.16a; 44 C.F.R. § 61.6. Kolbe's complaint states that he purchased coverage in an unspecified amount in excess of the minimum. See Compl. ¶ 26.

In August 2009, Kolbe's original mortgage company went bankrupt, and appellee Bank of America took over Kolbe's loan.[4] Through appellee Balboa Insurance Company, the Bank sent Kolbe notices in October and November 2009 stating that he was required to increase his flood insurance by $46,000 so that the total coverage would equal the replacement cost of his property as identified in his homeowner's insurance policy. The Bank warned that it would purchase the additional insurance itself, at an

---

[3] Technically, the statute requires the lender to require the borrower to obtain the insurance. See 42 U.S.C. § 4012a(b)(1).

[4] BAC Home Loans Servicing, LP, a wholly owned subsidiary of Bank of America, N.A., was the entity that originally took over the mortgage. BAC has now been merged into the Bank, and we thus refer to the defendant mortgage holder as "Bank of America" or "the Bank." Defendant Balboa Insurance Company also is a subsidiary of Bank of America. For convenience, we at times refer only to "the Bank" when describing acts allegedly performed by both defendants.

-4-

estimated cost to Kolbe of $237, if he did not acquire the insurance by December 6. The Bank further advised that the insurance it would purchase -- commonly known as "force-placed" or "lender-placed" insurance," see, e.g., Williams v. Certain Underwriters at Lloyd's of London, 398 F. App'x 44, 45 (5th Cir. 2010) (per curiam) -- might cost more and would likely be less comprehensive than coverage Kolbe could obtain on his own. In response to these notices, Kolbe bought the additional $46,000 in flood insurance.

In February 2011, Kolbe filed this action against Bank of America and Balboa on behalf of himself and others similarly situated for breach of the mortgage contract and breach of the contract's implied covenant of good faith and fair dealing. He claimed that his mortgage contract did not permit the Bank to demand increased coverage, and he alleged that the Bank had implemented a nationwide policy of compelling borrowers to maintain greater flood insurance than required by their mortgages or federal law. Kolbe's complaint asserted that the Bank was profiting from this improper policy because it often arranged for force-placed insurance to be purchased through its own affiliated companies and brokers.

The defendants moved to dismiss the complaint on the ground that Paragraph 4 of the mortgage unambiguously gives the lender the discretion to determine the amount of flood insurance

-5-

the borrower must carry. In its written decision, the district court agreed that the hazard-insurance provision can only be reasonably interpreted to afford discretion to the lender. The court concluded that the reference to "any hazards" in the first sentence of the paragraph encompasses flooding,[5] and, consequently, it held that the second sentence gives the lender the right to require that flood insurance, like other types of hazard coverage, "be maintained in the amounts and for the periods that [the] Lender requires." The court then considered the paragraph's third sentence, which explicitly refers to flood insurance, and held that it "merely specifies the required minimum coverage for flood insurance" under federal law -- i.e., it imposes a floor on the Bank's discretion to set the amount of flood insurance.

On appeal, Kolbe insists that Paragraph 4 addresses flood insurance solely by means of the third sentence -- which explicitly references such coverage -- and not by means of the generally phrased "all hazards" language in the first sentence. Alternatively, he maintains that this understanding is one of two reasonable constructions of the paragraph. Kolbe asserts that his interpretation supports his claim that the Bank breached the mortgage agreement and violated the contract's implied covenant of

---

[5] As reproduced above, the first sentence states: "Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance."

-6-

good faith and fair dealing by compelling him (and others similarly situated) to purchase flood insurance in excess of the outstanding loan balance.  Hence, Kolbe argues that the district court erred in dismissing his complaint for failure to state a claim.

## II.

The issue in this case is one of straightforward contract interpretation.  Appellant Kolbe asserts that the hazard and flood insurance sentences in Paragraph 4 are independent and, indeed, mutually exclusive.  Appellees maintain that the flood insurance sentence is subordinate to the general hazard sentence, merely limiting the Bank's discretion by incorporating the minimum coverage required by federal law.  Kolbe, in other words, argues that the contract does not permit the Bank to demand insurance beyond the amount "required by the Secretary," while appellees argue that the Bank may require any amount so long as the Secretary's minimum is met.

Whether the contract language at issue here is ambiguous is a question of law, Nye v. Ingersoll Rand Co., 783 F. Supp. 2d 751, 759 (D.N.J. 2011),[6] and, accordingly, our review of the district court's interpretation is de novo, Sumitomo Mach. Corp. of Am., Inc. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir.

---

[6] The parties agree that New Jersey law governs the state-law issue of contract interpretation because Kolbe's residence is located there, and Paragraph 14 of the mortgage provides that "federal law and the law of the jurisdiction in which the Property is located" govern.

1996).[7]  A contract is ambiguous if it "is susceptible of more than one meaning or if it is subject to reasonable alternative interpretations."  United States v. Pantelidis, 335 F.3d 226, 235 (3d Cir. 2003) (citation omitted) (internal quotation marks omitted); see also Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 948 A.2d 1285, 1289 (N.J. 2008).  Under New Jersey law, extrinsic evidence of context may be considered in determining ambiguity if "such evidence provides 'objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'"  Am. Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181 (3d Cir. 1995) (quoting Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)).  We must "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract."  Conway v. 287 Corporate Ctr. Assocs., 901 A.2d 341, 346 (N.J. 2006); see also SmithKline Beecham Corp. v. Rohm & Haas Co., 89 F.3d 154, 159 (3d Cir. 1996) (stating that New Jersey law requires "courts [to] interpret a contract considering 'the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction'" (quoting Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 767 F.2d 43, 47 (3d Cir. 1985))).

---

[7] Our review of a district court's dismissal of a complaint is likewise de novo.  See Román-Oliveras, 655 F.3d at 47.

## A. Breach of Contract

### 1.  The Language

Kolbe argues that the first three sentences of Paragraph 4 plainly address hazard insurance and flood insurance separately -- with hazard insurance covered by the first two sentences and flood insurance covered by the third -- and that only the amount of hazard insurance is left to the discretion of the lender.  For convenience, we again reproduce the pertinent language in full:

> 4.  **Fire, Flood and Other Hazard Insurance**. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary [of HUD].

Multiple characteristics of the provision suggest that Kolbe's interpretation is correct.  Importantly, the paragraph is structured to address two different categories of insurance, with the first and third sentences containing identical introductory language directing the borrower to insure "all improvements on the Property, whether now in existence or subsequently erected."  The repetition arguably denotes two parallel statements of coverage, each establishing a particular coverage requirement for the same property.  The first two sentences also are distinct from the third

because they address insurance required by the lender, while the third sentence addresses insurance required by the Secretary. The second sentence, referring to "This insurance," is written as a modification of the first sentence, addressing the required amount of the previously identified form of insurance. By contrast, the next sentence, referring to flood coverage, contains its own specification of amount -- "the extent required by the Secretary."

The view that Paragraph 4 imposes independent requirements for hazard and flood insurance is lent force by the title for the paragraph, which breaks out "fire" and "flood" from all other hazards. Each of those two specifically identified hazards is then explicitly referenced, separately, in one of the two parallel sentences. The fact that both "fire" and "flood" are mentioned in the title, but the "all hazards" sentence refers only to "fire," further supports the view that the flood coverage was handled by the separate, linguistically parallel third sentence.

Moreover, the word "also" in the flood-insurance sentence reinforces the independence of the two requirements by suggesting a separate, additional obligation -- i.e., in addition to the hazard insurance that is left to the lender's discretion for most types of hazards, the debtor must obtain flood insurance in the requisite amount. Indeed, if the flood-insurance sentence were meant merely to limit the discretion afforded in the prior sentence, it arguably would have been framed in direct relation to

that sentence. For example, it could have said: "Notwithstanding any requirements of the Lender, flood insurance must be obtained as required by the Secretary." The sentence as drafted, however, is not framed as a qualification on the previous sentence, but as an independent, further requirement.

Bank of America argues that the first sentence in Paragraph 4, which applies generally to coverage against "hazards, casualties, and contingencies," must be understood to include flood insurance because flooding is embraced by any reasonable understanding of those terms. Thus, the Bank asserts, the mortgage contract allows it to demand flood coverage as it chooses pursuant to the sentence stating that the hazard (or casualty or contingency) insurance "shall be maintained in the amounts and for the periods that Lender requires." The third sentence, according to the Bank, minimally cabins its discretion by requiring flood insurance at least "to the extent required by the Secretary."

We think appellant has the better argument based on the language and format of the paragraph. Nevertheless, we acknowledge that the Bank's interpretation can also be deemed reasonable. Floods unquestionably are a type of hazard, and they are thus literally within the scope of the first sentence. Moreover, the third sentence can be reasonably understood to declare the borrower's obligation to obtain flood insurance as required by the NFIA regardless of whether the lender requires any other form of

hazard insurance, but not to override the lender's exercise of discretion to require more.

Because the language is not decisive, we consider what the available extrinsic evidence tells us about the meaning of the provision.

### 2. The Extrinsic Evidence

As a preliminary matter, we note that the mortgage and certain public materials outside the complaint may properly be part of our inquiry in reviewing the district court's disposition of a motion to dismiss. See, e.g., Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (stating that a district court may consider "documents incorporated by reference [in the complaint], matters of public record, and other matters susceptible to judicial notice" without converting a motion to dismiss into a motion for summary judgment (internal quotation marks omitted) (alteration in original)).  We therefore refer liberally to publicly available HUD materials.

The debate over the clarity of Paragraph 4 centers on whether the reference to "any hazards" may reasonably be read to exclude the serious hazard of flooding.  Kolbe argues that flood damage ordinarily is not covered by standard homeowners' hazard insurance policies, and that it therefore is reasonable to conclude that such coverage is excluded from the mortgage contract's hazard insurance requirement.  The Bank responds that the absence of any

-12-

explicit exclusion for flood coverage in the "any hazards" sentence is the best evidence that flooding is a hazard within the meaning of that sentence.

Kolbe's view is advanced by the distinctive treatment routinely given to flood insurance by HUD, the agency responsible for FHA programs. Kolbe's mortgage contract contains standard HUD language specifying the mortgagor's insurance obligations.[8] Appellant points out that HUD's handbook for the "Administration of Insured Home Mortgages" treats hazard insurance and flood insurance separately. For example, in a list of items linked to a home sale that must be escrowed, hazard insurance is listed as the first item and flood insurance is listed as the sixth item. See HUD Handbook 4330.1, ch. 2, § 2-1(D), available at http://portal.hud.gov/hudportal/HUD?src=/program_offices/administration/hudclips/handbooks/hsgh/4330.1 (last visited Sept. 18, 2012). The HUD handbook also contains a section labeled "Payment of Bills and Taxes from Escrow Accounts" that lists the two types of coverage separately. See id. ch. 2, § 2-8(D) (Hazard Insurance) & (E) (Flood Insurance); see also id. at § 2-11(E) (separately listing "Dwelling Insurance," "Flood Insurance," and "Homeowner's Policies" under "Types of Coverage"). Similarly, HUD's sample settlement statement for a home purchase separately itemizes

_____

[8] Paragraph 4 is one of sixteen "uniform covenants" included in the FHA Model Mortgage Form for single-family homes. See FHA Single Family Origination Handbook 4165.1, App'x II, supra.

"Hazard Insurance Premium" on Line 903 and "Flood Insurance" on Line 904.  See "Buying Your Home" (June 1997), Section III, a v a i l a b l e   a t  http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_12893.pdf (last visited Sept. 18, 2012).

HUD's practice of treating flood coverage separately reflects Congress's specific concern about such insurance, which led to the enactment of the NFIA in 1968.  Following years of major floods that required "unforeseen disaster relief measures and . . . placed an increasing burden on the Nation's resources," Congress identified a widespread gap in private flood insurance coverage.  42 U.S.C. § 4001(a); see also H.R. Rep. No. 90-1585 (1968), reprinted in 1968 U.S.C.C.A.N. 2873, 2966-2967 (noting that "[h]eavy losses over the years from hurricanes in the coastal areas and from storms in inland areas of the Nation dramatize the lack of insurance protection against flood damage").  The legislators found that it was "uneconomic" for private insurers to make flood insurance available "on reasonable terms and conditions," 42 U.S.C. § 4001(b)(1), and they sought to bridge the gap through a cooperative program between the federal government and the insurance industry, id. § 4001(b)(2).[9]  Thus, in effect, Congress

_____

[9] Congress anticipated that the National Flood Insurance Program ("NFIP") authorized by the NFIA would rely on a pool of insurance companies "to assume a reasonable proportion of responsibility for the adjustment and payment of claims for losses."  42 U.S.C. § 4051(a)(2); see also id. § 4011 (authorizing

-14-

found that floods were not customarily among the hazards protected by standard homeowners' insurance policies.  See Mitchell F. Crusto, The Katrina Fund: Repairing Breaches in Gulf Coast Insurance Levees, 43 Harv. J. on Legis. 329, 335 (2006) ("The insurance industry has generally excluded flood damage in a homeowners policy because flood insurance is not commercially viable."); US Gov't Accountability Office, GAO 07-1078, National Flood Insurance Program: FEMA's [Federal Emergency Management Agency] Management and Oversight of Payments for Insurance Company Services Should be Improved, at 8 (2007) (noting that "flooding is generally excluded from homeowner policies that typically cover damage from other losses, such as wind, fire, and theft").[10]

---

the program).  Federal funds would subsidize the program.  Id. §§ 4054(a) (directing the Administrator of the Federal Emergency Management Agency to make periodic payments to the pool to ensure that "flood insurance [is] available on reasonable terms and conditions"); 4055(a) (authorizing reinsurance provided by the government for losses in excess of the pool's assumption of responsibility); see also Suopys v. Omaha Prop. & Cas., 404 F.3d 805, 807 (3d Cir. 2005) (noting that "[t]he NFIP is underwritten by the United States Treasury in order to provide flood insurance below actuarial rates").

[10] HUD also recognizes the standard industry practice in guidance about flood insurance requirements that is provided on its website:

> Generally, homeowner and other property casualty insurance policies do not provide coverage for potential financial loss that may be caused by flooding damage. Many of the private insurance companies are now marketing policies offered by the National Flood Insurance Program along with their own property casualty insurance policies.

HUD's practice of treating flood insurance independently is pertinent to our interpretation of Paragraph 4 of the FHA's model language, see Pacifico v. Pacifico, 920 A.2d 73, 78 (N.J. 2007) (noting that the terms of a contract are to be examined "in light of the common usage and custom"); Kearny PBA Local No. 21 v. Town of Kearny, 405 A.2d 393, 400 (N.J. 1979) (listing custom and usage among the "interpretative devices" for discovering contractual intent), and Kolbe's interpretation has particular force where, as here, the mortgage separately addresses flood-insurance coverage. By contrast, if there were no explicit reference to flooding as a specific harm requiring insurance coverage, the assertion that flooding is not embraced by a reference to "any hazards" would be considerably less potent. That was the situation in Custer v. Homeside Lending, Inc., 858 So.2d 233 (Ala. 2003), on which the district court relied in rejecting the ambiguity of the language in Kolbe's mortgage.[11] The explicit

---

http://portal.hud.gov/hudportal/HUD?src=/program_offices/comm_pla nning/environment/review/qa/floodinsurance (last visited Sept. 18, 2012).

[11] The comparable provision in Custer stated:

"7. That [the Mortgagor] will keep the improvements now existing or hereafter erected on the mortgaged property, insured as may be required from time to time by the Mortgagee against loss by fire and other hazards, casualties and contingencies in such amounts and for such periods as may be required by the Mortgagee and will pay promptly, when due, any premiums on such insurance provision for payment of which has not been made hereinbefore."

attention to flood insurance in Kolbe's mortgage materially distinguishes that case from this one.

The Bank, however, reasonably asserts that it makes no sense to read floods out of the "any hazards" sentence because it would be unreasonable to bar a mortgage provider from requiring more than the limited amount of insurance required by federal law, i.e., the amount of the outstanding loan balance. It argues that lenders have an interest in ensuring the long-term performance of mortgage loans by protecting the replacement value of the property, as it sought to do in this instance. It cites FEMA guidelines advising lenders to require replacement-value insurance. See Fed. Emergency Mgmt. Agency, National Flood Insurance Program: Mandatory Purchase of Flood Insurance Guidelines 27-28 (2007), available at http://www.fema.gov/library/viewRecord.do?id=2954 (last visited Sept. 18, 2012). Interagency guidance makes explicit that lenders may demand more flood insurance coverage than is required by law, stating that "[e]ach lender has the responsibility to tailor its own flood insurance policies and procedures to suit its business needs and protect its ongoing interest in the collateral." 74 Fed. Reg. 35914, 35936 (July 21, 2009), 2009 WL 2143410 (F.R.) (Question 16);[12] see also Notice, Loans in Areas Having Special Flood Hazards,

---

Custer, 858 So.2d at 237 (emphasis in original).

[12] The FHA is not one of the agencies that issued the guidance. They were: Office of the Comptroller of the Currency, Treasury; the Board of Governors of the Federal Reserve System; the Federal

76 Fed. Reg. 64175, 64182 (Oct. 17, 2011) (Question 9) (noting that, "[i]n cases involving certain residential . . . properties, insurance policies should be written to, and the insurance loss payout would be the equivalent of, [replacement cost]").

We acknowledge that lenders may have good reason to require full replacement coverage. Nonetheless, in mandating minimum coverage in an amount "equal to the outstanding principal balance of the loan," 42 U.S.C. § 4012a(b)(1), Congress in the NFIA appears to have incorporated an assumption that, at times, a more limited amount of flood insurance may be reasonable and appropriate. The view that the amount of mandatory insurance should be kept to a minimum also is reflected in the insurance coverage section of HUD's Handbook, which provides that "[t]he mortgagee may not insist on more coverage than is necessary to protect its investment." HUD Handbook 4330.1, ch. 2, § 2-11(B), supra.[13]

Indeed, it is plausible that the FHA, which prescribes Paragraph 4 as a "uniform convenant[] for national use," App'x at 31 (Kolbe mortgage), would have sought to balance the need for

_____

Deposit Insurance Corporation; the Office of Thrift Supervision, Treasury; the Farm Credit Administration, and the National Credit Union Administration.

[13] Of course, this statement may not mean that the insurance should be limited to the amount of the outstanding balance because, as discussed above, a lender may deem replacement-value coverage "necessary to protect its investment."

privately funded disaster relief with a concern that insurance costs not become a barrier to home ownership. HUD's mission, carried out through the FHA and other programs, is in part "to create strong, sustainable, inclusive communities and quality affordable homes for all." See HUD Mission, http://portal.hud.gov/hudportal/HUD?src=/about/mission (last visited Sept. 18, 2012). From the perspective of facilitating "affordable homes," Paragraph 4 as construed by Kolbe could reasonably be understood to reflect a policy choice to cap mandatory flood insurance at the amount of the outstanding loan balance.[14] See generally S. Rep. No. 87-281 (1961), reprinted in 1961 U.S.C.C.A.N. 1923, 1925-26 (discussing amendments to the National Housing Act of 1934 ("NHA") that, inter alia, created "a new FHA mortgage insurance program" to further "the national housing policy of 'a decent home and suitable living environment for every American family'"); Cienega Gardens v. United States, 503 F.3d 1266, 1270 (Fed. Cir. 2007) (noting that the 1961 amendments were designed to "'meet[] the housing needs of moderate-income families'" (quoting S. Rep. No. 87-281, reprinted in 1961 U.S.C.C.A.N. at 1926)).

---

[14] Indeed, the model Paragraph 4 used in Kolbe's FHA mortgage does not mandate any insurance for hazards other than floods, as it leaves any such requirement to the lender's discretion. See HUD Handbook 4330.1, ch. 2, § 2-8(D), supra ("While HUD does not require mortgagors to carry hazard insurance, the mortgage does permit mortgagees to require it.").

The dissent invokes the industry practice of limiting "all-risk" policies by means of express flood-exclusion provisions to argue that, absent such an exclusion in the FHA model mortgage, "any hazards" in the first sentence of Paragraph 4 can only reasonably be read to include flooding. That view, however, reflects the dissent's basic flaw of ignoring the reasonable arguments in Kolbe's favor. It is plausible that HUD responded to the standard industry practice of treating floods as a distinct hazard by developing a mortgage document that deals with flood coverage separately from the coverage for other hazards. Indeed, as discussed above, the repetitive format of the "any hazards" and flood-insurance sentences in Paragraph 4 suggests parallel, independent obligations. Hence, contrary to the dissent's assertion, the general industry practice is no more helpful to the Bank's position than it is to Kolbe's.[15]

The extrinsic evidence thus leaves us in much the same place as our examination of Paragraph 4's text and structure. The HUD documents showing that the agency routinely treats hazard and flood insurance independently are persuasive evidence in support of Kolbe's assertion that Paragraph 4 separately addresses the two types of insurance and fixes the required amount of flood insurance

---

[15] It bears repeating that we are reviewing the grant of a motion to dismiss. The Bank will have the opportunity to develop a record in support of its position and, if appropriate, to seek summary judgment.

at the statutory minimum amount.  At the same time, however, the FEMA guidelines recommending replacement value coverage support the Bank's view that Paragraph 4 is not reasonably construed to prevent lenders from fully protecting their investments and, hence, must be read to give the lender discretion to increase the requirement above the statutory minimum.

The question, of course, is not what amount of flood insurance a lender reasonably could require, but what this particular HUD mortgage provision in fact permits the lender to demand.  See Hofstetter v. Chase Home Fin., LLC, 751 F. Supp. 2d 1116, 1127 n.3 (N.D. Cal. 2010) ("Simply because an agency recommends that lenders maintain a certain amount of flood insurance coverage does not mean that lenders have carte blanche to do so without regard to the terms of their loan agreements with borrowers.").  As to that question, we conclude that a rational jury could construe Paragraph 4 in favor of either Kolbe or the Bank.  Though the text of Paragraph 4 and the extrinsic evidence both provide strong support for Kolbe's interpretation, his reading is not the only reasonable one.[16]  See Morris v. Wells Fargo Bank, N.A., No. 2:11-cv-00474 (W.D. Pa. Sept. 7,2012) (denying motion to dismiss breach of contract claim involving same language) (stating

---

[16] Indeed, the dissent plausibly marshals support for the Bank's interpretation of the mortgage language.  It fails, however, to give comparable respect to the factors that favor Kolbe's interpretation.

-21-

that, "[a]t the very least, plaintiff's interpretation is tenable"); Wulf v. Bank of America, 798 F. Supp. 2d 586, 588 (E.D. Pa. 2011) (same); Skansgaard v. Bank of America, No. C11-988 RJB, slip op. at 4 (W.D. Wash. Oct. 13, 2011) (same). Kolbe has therefore stated a plausible breach of contract claim, and, hence, the district court erred in dismissing his complaint on the ground that the mortgage unambiguously permitted the Bank to demand the additional $46,000 in coverage. See Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (holding that "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim" (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)).[17]

## B. The Covenant of Good Faith and Fair Dealing

Kolbe alleges that the defendants acted in bad faith and consequently breached the implied covenant of good faith and fair

---

[17] Kolbe argues that any ambiguity in the mortgage should be construed against the Bank as the "drafter" of the agreement. The Bank argues in response that the doctrine giving the advantage to the non-drafting party in a dispute over language does not apply where the language at issue is prescribed by law. See Restatement (Second) of Contracts § 206(b) ("The rule that language is interpreted against the party who chose it has no direct application to cases where the language is prescribed by law, as is sometimes true with respect to insurance policies, bills of lading and other standardized documents."). Kolbe acknowledges that the "FHA required that the Mortgage Agreement conform to its requirements," Compl. ¶ 18, and we thus reject the doctrine as a basis for judgment against the Bank at this stage of the case. Kolbe remains free to re-argue the issue as warranted upon further development of the facts.

dealing by demanding flood insurance in an amount in excess of the coverage required by his mortgage. The covenant, implied in every contract in New Jersey, imposes a duty on each party to refrain from "'destroying or injuring the right of the other party to receive the fruits of the contract.'" Sons of Thunder, Inc. v. Borden, Inc., 690 A.2d 575, 587 (N.J. 1997) (quoting Palisades Props., Inc. v. Brunetti, 207 A.2d 522, 531 (N.J. 1965)); see also Kalogeras v. 239 Broad Ave., L.L.C., 997 A.2d 943, 953 (N.J. 2010); Restatement (Second) of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").

The New Jersey Supreme Court has described good faith conduct as "conduct that does not 'violate community standards of decency, fairness or reasonableness,'" Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 864 A.2d 387, 395 (N.J. 2005) (internal quotation mark omitted) (quoting Restatement (Second) of Contracts § 205 cmt. a), and that is "'consisten[t] with the justified expectations of the other party,'" Wilson v. Amerada Hess Corp., 773 A.2d 1121, 1126 (N.J. 2001) (quoting Restatement (Second) of Contracts § 205 cmt. a). In New Jersey, a showing of "'bad motive or intention' is vital to an action for breach of the covenant." Brunswick Hills Raquet Club, 864 A.2d at 225 (quoting Wilson, 773 A.2d at 1130).

The Bank asserts that no jury could find that the Bank acted in bad faith by taking the objectively reasonable step of requiring insurance in the amount recommended by FEMA. We agree that, given the ambiguity in Paragraph 4, requiring replacement-value coverage would on its own fall short of demonstrating bad faith. Kolbe's claim, however, does not rest solely on the demand for increased coverage. The Bank warned Kolbe that if he failed to purchase additional coverage, force-placed insurance would be obtained, possibly through entities related to Bank of America, at a premium that "may be more expensive and will likely provide less coverage than . . . you can obtain on your own." App'x at 43 (Notice to Kolbe, Oct. 18, 2009).

This ultimatum could constitute bad faith under either of two scenarios. The first would be if the Bank, notwithstanding our conclusion that Paragraph 4 is ambiguous, had in fact believed that the mortgage required flood insurance coverage only in the amount of the outstanding principal balance of the mortgage (or $250,000, if that were the lower amount) and, hence, did not authorize the Bank's demand for additional coverage at additional expense to the borrower. Evidence that the Bank made the demand despite this belief, so that it might have the opportunity to gain financially from the purchase of insurance through its related entities, would plainly suggest the "bad motive or intention" that is at the core of a breach of the implied covenant. See Brunswick Hills Raquet

-24-

Club, 864 A.2d at 225. A finding of bad faith also would be supportable if the Bank had recognized the ambiguity in Paragraph 4 and, instead of acting out of concern for protecting its security, had seized upon the ambiguity as a money-making opportunity. Again, a decision to demand additional insurance for the purpose of generating business for its affiliated insurance companies, and thereby increase Bank profits, would reflect the improper motive necessary to demonstrate a breach of the covenant of good faith and good dealing.

We conclude that the allegations plausibly support such a contention of improper motivation: Kolbe alleges that the Bank demanded flood insurance in excess of his obligations under the contract, see Compl. ¶¶ 13, 25-26, 32,[18] that it did so in bad

_____

[18] These paragraphs allege, in pertinent part, as follows:

13.    Defendants have a nationwide policy and practice of requiring mortgagors of mortgages on real estate located in geographic areas designated by the United States government as having "special flood hazards" to maintain flood insurance coverage in an amount equal to the lesser of an amount established by Defendants or the maximum flood insurance coverage available under the National Flood Insurance Act of 1968 . . . . Defendants apply and enforce Defendants' Flood Insurance Coverage Requirement even if it exceeds the mortgagor's flood insurance coverage obligations and Defendant BAC Home Loans' flood insurance rights under the mortgage agreements.

25.    [P]ursuant to the . . . provision of the Mortgage Agreement and the applicable FHA regulations, Plaintiff was required to maintain flood insurance coverage for the Property in an amount equal to the lesser of the outstanding balance on the Loan (less

faith, id. ¶ 55,[19] and that the Bank or its related entities would profit through the purchase of force-placed insurance, id. ¶¶ 15, 16.[20]  These allegations, in effect, amount to a claim that the

estimated land costs) or the $250,000 maximum flood insurance available under the Flood Insurance Act.

26.  At all times . . . Plaintiff has maintained flood insurance coverage on the Property in excess of the outstanding balance of the Loan . . . .  That flood insurance coverage was greater than the amount of flood insurance that Plaintiff was contractually obligated to maintain on the Property pursuant to the Mortgage Agreement and the above-referenced applicable FHA regulations.

32. Defendants' requirement that Plaintiff purchase additional flood insurance was neither required by, nor permitted by, the Mortgage Agreement.  . . . [T]he Mortgage Agreement requires Plaintiff to maintain flood insurance coverage of at least the outstanding balance of the Loan less estimated land costs.  Plaintiff was already maintaining this level of flood insurance coverage on the Property when the Defendants sent him the October 18 and November 16, 2009 letters.  Accordingly, Plaintiff was fully satisfying his flood insurance coverage obligation under the Mortgage Agreement and fully fulfilling the Defendant BAC Home Loans' flood insurance coverage rights under the Mortgage Agreement.

[19] Paragraph 55 alleges:

By requiring Plaintiff and the Class to maintain and pay for flood insurance coverage in excess of the coverage required by their mortgage agreements, Defendants acted in bad faith and breached the implied covenant of good faith and fair dealing contained in the mortgage agreements.

[20] These paragraphs allege:

15.  Defendants enforce Defendants' Flood Insurance Coverage Requirement by demanding that the mortgagors obtain the amount of flood insurance coverage required by Defendants.  If the mortgagors fail to comply with

-26-

Bank's motivation for demanding additional flood insurance coverage was to increase corporate profits by funneling new coverage to its own affiliates.[21]   See, e.g., Abels v. JPMorgan Chase Bank, N.A., 678 F. Supp. 2d 1273, 1276, 1278-79 (S.D. Fla. 2009) (declining to dismiss claim alleging breach of implied covenant where plaintiffs asserted that defendant "engaged in self-dealing by purchasing insurance from one of its own affiliates"); cf. Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 9 (1st Cir. 2011) (holding that "plaintiff's implied covenant claims founder because his complaint contains only a threadbare allegation that 'the defendant terminated

_____

Defendants' demand, Defendants purchase flood insurance coverage so that the total insurance coverage on the real estate will meet Defendants' Flood Insurance Coverage Requirement.  Defendants then charge the mortgagors for the cost of that additional insurance by either deducting the insurance premiums from the escrow accounts maintained by the mortgagors with Defendant BAC Home Loans or by increasing the mortgagors' monthly mortgage payments.

16.  Defendants or their corporate subsidiaries or affiliates profit when Defendants buy insurance for mortgagors.  Defendants often purchase the insurance from Defendants' own affiliated insurance companies, including Defendant Balboa, and/or place the insurance through Defendants' own affiliated insurance brokers. Defendants' affiliated insurance brokers receive commissions on these insurance transactions and Defendants' affiliated insurance companies, including Balboa, receive the insurance premiums involuntarily paid by the mortgagors.

[21] Appellant argues that this alleged self-dealing would breach the implied covenant even if the mortgage gave the Bank the authority to require increased amounts of flood insurance.

[him] in bad faith . . . unaccompanied by any factual allegations that might give rise to an inference of bad-faith conduct").[22]

The Bank contends that such a self-dealing claim fails as a matter of law because Kolbe responded to the Bank's ultimatum by purchasing the insurance himself, and the Bank therefore did not benefit from Kolbe's acquisition of additional insurance. The Bank cites no cases in support of its implicit contention that bad-faith conduct designed to provide an <u>opportunity</u> for self-dealing cannot constitute a breach of the implied covenant of good faith and fair dealing under New Jersey law. Kolbe's decision under duress to avoid the higher cost of force-placed insurance would seem an inadequate defense if the Bank's motivation were improper. In any event, in the absence of developed argument from the Bank, no more needs to be said on this issue at this early stage of the case.

We thus conclude that the complaint alleges sufficient facts to establish a breach of the covenant of good faith and fair dealing that is "'plausible on its face,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570). Hence, the claim should not have been dismissed.

---

[22] The equivalent allegations in the other flood insurance case we decide today, <u>Lass</u> v. <u>Bank of America, N.A.</u>, No. 11-2037, are more explicit. The plaintiff there alleged that the Bank had breached the covenant of good faith and fair dealing by, <u>inter alia</u>, "charging borrowers sham 'costs' for flood insurance that did not reflect the true cost to Bank of America because a portion of such 'costs' were retained by Bank of America and/or its affiliates (or kicked back to them) as commissions or 'other compensation.'" Compl. ¶ 75, App'x at 45.

**III.**

Defendants argue that the district court's judgment in favor of Balboa should be affirmed even if the complaint is reinstated against Bank of America. We agree. Balboa's alleged involvement in the matters underlying Kolbe's lawsuit was limited to preparing and sending the letters notifying Kolbe that he needed to purchase additional flood insurance. See Compl. ¶ 29. Those letters were sent on the letterhead of the Bank's predecessor, BAC Home Loans Servicing, LP. The complaint is devoid of allegations showing a contractual relationship between Kolbe and Balboa, and Kolbe's bald assertion that Balboa "acted on its own behalf" in "all of the actions described herein," id. ¶ 21, is inadequate to state a plausible claim against the insurer for breach of contract or breach of the implied covenant of good faith and fair dealing.[23] Hence, we affirm dismissal of the complaint against Balboa.

**IV.**

For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. Costs are awarded to the appellant.

So ordered.

---

[23] Of course, the allegations concerning Balboa's role in providing force-placed insurance at the Bank's behest remain relevant to the implied covenant claim against the Bank.

**- Dissenting Opinion Follows --**

**BOUDIN**, <u>Circuit Judge</u>, **dissenting**.  On October 6, 2008, the plaintiff-appellant Stanley Kolbe took out a $197,437 loan secured by a mortgage on Kolbe's home in Atlantic City, New Jersey, in an area designated by the government as subject to flooding.  The mortgage was guaranteed by an agency within the Department of Housing and Urban Development ("HUD"), and as required, the mortgage used a standard form that had been approved by HUD, 24 C.F.R. § 200.80 (2012).  The mortgage contained the following provision:

> 4.  Fire, Flood and Other Hazard Insurance. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance.  This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary [of HUD].

The first two sentences, referring to "any hazards, casualties, and contingencies," empower the lender to set the "amounts and periods" of insurance for all such threats.  The third sentence reflects a requirement imposed by the government under a federal program by which it subsidizes flood insurance in flood prone areas: in aid of that program, lenders are restricted in making loans unless the borrower agrees to maintain flood insurance in the <u>minimum</u> amounts set by the government regardless of whether the lender independently requires flood insurance.  42 U.S.C. §§ 4012(c), 4012a(b)(1) (2006).

-31-

When Kolbe's original mortgage holder went bankrupt in 2009, the mortgage passed into the hands of entities associated with Bank of America (and for convenience we refer only to that bank). Within a couple of months the bank wrote to Kolbe requiring that he purchase an additional $46,000 in flood insurance. The letters advised that if he did not purchase such insurance within a set period, the bank would purchase it for him and charge him for the cost but that this might well be more expensive than if he obtained the insurance on his own behalf.

Kolbe complied, purchasing the insurance out of an escrow account maintained on his behalf by the bank for insurance and similar purposes, and not long after filed the current class action in federal district court. His complaint, alleging breach of contract and breach of the implied covenant of good faith and fair dealing, claimed that it was unlawful for the bank to require flood insurance in any amount exceeding that required by the government under the flood insurance program already mentioned and reflected in the third sentence of paragraph quoted above.

The district court, without certifying a class, granted the bank's motion to dismiss. Fed. R. Civ. P. 12(b)(6). The court found that the original loan agreement clearly permitted the bank to require more insurance for "any hazard," the Secretary of HUD's flood insurance requirement reflecting merely a minimum imposed by the government; and the court ruled that no facts alleged in the

complaint about the bank's motive, or the additional insurance required by the bank, impugned the bank's good faith. <u>Kolbe</u> v. <u>BAC Home Loans Servicing, L.P.</u>, No. 11-10312-NMG, 2011 WL 3665394 (D. Mass. Aug. 18, 2011). This appeal followed.

The insurance required by the government, under the third sentence of the above quoted paragraph 4 in the mortgage, equated to the outstanding unpaid balance on the loan, <u>i.e.</u>, $197,437 less whatever payments Kolbe had already made to reduce the principal balance. The additional $46,000 requested by the bank apparently aimed to raise the total insurance to the approximate replacement cost of Kolbe's house if it were destroyed in a flood--a familiar although not invariable practice in mortgage lending and reflected in government guidance by the Federal Emergency Management Agency.[24]

The bank's interest is obvious enough: it seeks not merely repayment of the outstanding balance but the maintenance of a loan on which it earns the designated interest for the period agreed to-- a goal served by providing funds to restore a damaged house that might otherwise be abandoned. Further, despite the mortgage and any

---

[24]<u>National Flood Insurance Program: Mandatory Purchase of Flood Insurance Guidelines</u> 27 (2007), http://www.fema.gov/library/viewRecord.do?id=2954. Replacement cost insurance has been endorsed as necessary to prevent "underinsurance," whereby property owners are left with insufficient resources to rebuild their property in the wake of a catastrophe. <u>See generally</u> Wells, <u>Insuring to Value: Meeting a Critical Need</u> (2d ed. 2007); Klein, <u>When Enough Is Not Enough: Correcting Market Inefficiencies in the Purchase and Sale of Residential Property Insurance</u>, 18 Va. J. Soc. Pol'y & L. 345 (2011).

clause in the insurance contract entitling the lender to insurance proceeds, other claims, such as priority tax claims, may supercede the bank's own right to insurance proceeds and leave it without full coverage for the balance due. N.J. Stat. Ann. § 54:5-9 (West 2012). See generally Alexander, Tax Liens, Tax Sales, and Due Process, 75 Ind. L.J. 747, 770-71 & nn. 129-130 (2000).

The first two sentences of the relevant paragraph of the mortgage agreement (block quoted above) unambiguously give the bank the right to require more flood insurance by empowering it to require insurance in the amount it specifies for "any hazards." A flood qualifies as a hazard, commonly defined as "an unavoidable danger or risk, even though often foreseeable." The Random House Dictionary of the English Language 879 (2d ed. unabridged 1987). The third sentence is directed to what the government sets as a minimum amount of flood insurance for its own reasons and neither qualifies nor contradicts the right of the bank--explicitly reserved--to set a different amount that is higher than the government minimum.

Kolbe says that because the third sentence specifically deals with flood insurance, this specific provision should implicitly limit the first two sentences to exclude floods. But a specific provision trumps a general provision only when the two are in conflict, so it is necessary to disregard or limit one or the other. See Farnsworth, 2 Farnsworth on Contracts § 7.11, at 297 (3d

ed. 2004). Here, the two provisions are consistent: one lists the bank's requirements, and the other lists the government's requirements and, since they are both minimum requirements, both can be met by flood insurance in the amount of the higher requirement.

Relatedly, Kolbe asserts that if the first two sentences are read to include floods, the third sentence will be rendered meaningless surplusage, a result that should be avoided because the third sentence uses the word "also." But this too is false; HUD's requirement applies even if the lender requires less or no flood insurance, and the reference to HUD's requirements was specifically required by federal law, see 24 C.F.R. § 203.16a(a)(2), which is presumably why they were made the subject of a separate sentence. Without some such warning, the bank would itself be subject to monetary penalties under the flood insurance regime. 42 U.S.C. § 4012a(f)(2).

Kolbe argues that the phrase "any hazards" should be read to exclude floods because in the insurance industry, hazard insurance is traditionally seen as a category separate from flood insurance. The contention rests on a confusion about industry practice. Many homeowners' hazard insurance policies, known as "all-risk" policies, cover against all physical risks unless specifically excluded, Thomas & Randall, New Appleman on Insurance Law § 41.02[1][a], at 41-15, § 41.02[1][a], at 41-15 (library ed. 2011), and then contain an express "flood exclusion" provision that

excludes flooding and water damage from coverage, <u>id</u>. ch. 43, at 43-2, 43-14.

Thus, the standard all-risk policy does treat floods as a hazard but excludes it from the policy as a hazard that the policy does not choose to insure.  Consider, for example, typical language of a flood exclusion:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>              . . . .
>              . . . Water
>                  . . . Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not . . .

<u>In re Katrina Canal Breaches Litig.</u>, 495 F.3d 191, 199 (5th Cir. 2007), <u>cert. denied</u>, 552 U.S. 1182 (2008) (quoting policy language).

In other words, the standard policy excludes flood insurance, and relegates the insured to seek special insurance for floods, because the policy <u>explicitly says that floods are not covered by the policy</u>.  By contrast, nothing in the loan agreement says that the bank's authority to fix the amount of insurance for "any hazards" excludes floods.  The reference to standard hazard policies, which do contain such an exclusion, is helpful to the bank and not to Kolbe--by confirming that "hazard" includes "flood" unless expressly excluded--as if any such help were needed.

Similarly, while some HUD documents list "hazard insurance" and "flood insurance" separately,[25] this merely reflects the reality that because of the express exclusions in all-risk policies, a homeowner who wants flood insurance will have to obtain it separately. But the fact that a separate policy must be purchased is irrelevant: the mortgage holder has an explicit right to require increased insurance for "any" hazard regardless of how the policy for the hazard in question is packaged or procured. In fact, both the statute creating the federal flood insurance program and a handbook from the Federal Emergency Management Agency refer to "special flood hazards." 42 U.S.C. § 4012a(a); Compl. ex. 2, at 4.

Turning to the good faith count, the governing law in New Jersey requires proof of bad motive for a claim of breach of the implied covenant. <u>Wilson</u> v. <u>Amerada Hess Corp.</u>, 773 A.2d 1121, 1130 (N.J. 2001). Kolbe's main position in the district court was that the contract by its terms limits the bank to the amount of flood insurance required by the federal government, so anything more is

---

[25]For example, HUD's handbook on insured mortgages lists items that must be included in an escrow account, including "hazard insurance" and "flood insurance premiums." HUD Handbook 4330.1, ch. 2, § 2-1(D), http://portal.hud.gov/hudportal/documents/huddoc?id=43301c2HSGH.pdf. Similarly, HUD's guide brochure on settlement costs related to home purchases lists "Hazard Insurance Premium" and "Flood Insurance" as separate settlement costs. U.S. Dept. of Housing and Urban Dev., <u>Buying Your Home: Settlement Costs and Helpful Information</u> 16 (June 1997), <u>available at</u> http://portal.hud.gov/hudportal/documents/huddoc?id=DOC_12893.pdf.

necessarily an act of bad faith.  This claim depends on the premise that Bank of America breached the contract, which as discussed above, is self-evidently wrong.

On appeal, Kolbe now suggests that "the only reason Defendants demanded additional flood insurance was an improper effort to self-deal . . . collecting for [them]sel[ves] or [their] affiliates insurance brokerage commissions and excessive premiums." Appellants' Br. at 14-15.  The complaint contains no such allegation and so any such claim is forfeit.  In re New Motor Vehicles Canadian Exp. Antitrust Litig., 533 F.3d 1, 5-6 (1st Cir. 2008).  Anyway, as already noted, the bank has self-evident commercial reasons for wanting a margin of protection over and above the unpaid principal balance and it asked Kolbe to buy the insurance himself.

This appeal calls for little more than a per curiam affirmance of a plainly correct disposition by the district court. It is one thing to read ambiguous language in favor of the borrower; it is quite another to disregard clear language that has only one sensible reading supported by salient practical reasons for why that reading was intended.  Language of the same ilk appears to be common in loan agreements.  To let this case proceed will be the source of great mischief.